# United States Court of Appeals
## For the First Circuit

No. 19-2030

UNITED STATES OF AMERICA,

Appellee,

v.

MOHAMED ABDULAZIZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Kayatta and Barron, Circuit Judges,
and Smith,* District Judge.

Michael Tumposky, with whom Hedges & Tumposky, LLP, was on brief, for appellant.
Christine J. Wichers, Assistant United States Attorney, with whom Andrew E. Lelling, United States Attorney, was on brief, for appellee.

June 2, 2021

_____

* Of the District of Rhode Island, sitting by designation.

BARRON, **Circuit Judge**. Mohamed Abdulaziz ("Abdulaziz") challenges his five-year prison sentence for committing a federal firearms offense in violation of 18 U.S.C. § 922(g). He contends that the District Court erred in applying the enhancement set forth in § 2K2.1(a)(2) of the United States Sentencing Guidelines to him at his sentencing. That guideline subjects a defendant who has been convicted of a § 922(g) offense to a higher base offense level ("BOL") under the Guidelines if he committed that offense "subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a)(2). The question that we must decide turns on a purely legal question: what constitutes a "controlled substance" within the meaning of this guideline? Because we conclude that the District Court erred in resolving it, we vacate the judgment imposing the sentence and remand the case for further proceedings.

**I.**

On January 3, 2019, a federal grand jury in the District of Massachusetts indicted Abdulaziz on one count of possession of a firearm and ammunition by a prohibited person in violation of 18 U.S.C. § 922(g)(1). The charged conduct was alleged to have occurred on September 2, 2018. Abdulaziz pleaded guilty to the offense on June 13, 2019.

The United States Probation Office prepared a presentence investigation report ("PSR"). Among other things, the

PSR calculated Abdulaziz's Guidelines Sentencing Range ("GSR") for his § 922(g) offense. The PSR based the calculation in part on the application of the § 2K2.1(a)(2) enhancement.

The PSR determined that the enhancement applied based on three state law felony convictions that Abdulaziz had sustained before he committed the § 922(g) offense. The PSR determined that, under the guideline, two of those convictions were of "crime[s] of violence" and one was of "a controlled substance offense." U.S.S.G. § 2K2.1(a)(2).

At the sentencing hearing on September 26, 2019, Abdulaziz did not dispute the PSR's determination that his January 2010 Massachusetts conviction of assault with a dangerous weapon (firearm) in violation of Mass. Gen. Laws ch. 265, § 15B(b) -- which he sustained prior to committing the § 922(g) offense -- qualified under § 2K2.1(a)(2) as a "felony conviction[]" of "a crime of violence." The District Court noted at the hearing, however, that the government was "not arguing" that the other conviction that Abdulaziz sustained prior to committing the § 922(g) offense and that the PSR had determined qualified as a "felony conviction[]" of "a crime of violence" -- his April 2018 Massachusetts conviction for unarmed assault with intent to rob in violation of Mass. Gen. Laws ch. 265, § 20 -- also qualified as such a "felony conviction[]" of "a crime of violence."

Thus, the application of the enhancement turned on whether the third state law felony conviction that Abdulaziz sustained prior to committing the § 922(g) offense and that the PSR had determined was of a qualifying offense -- namely, his July 2014 Massachusetts conviction for possession with intent to distribute "Marihuana," which the underlying state statute defined to be a "controlled substance," Mass. Gen. Laws ch. 94C, §§ 31, Class D(b)(1), 32C(a) (effective July 1, 2014) -- qualified as a "felony conviction[]" of "a controlled substance offense" under § 2K2.1(a)(2). For, if it did, then Abdulaziz would have committed the § 922(g) offense "subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a)(2).

The District Court sided with the government and against Abdulaziz by ruling that this July 2014 Massachusetts conviction did so qualify. The District Court accordingly applied the enhancement and determined Abdulaziz's BOL to be 24, rather than either 22 or 20 as it would have been if the enhancement did not apply. See U.S.S.G. § 2K2.1(a)(3)-(4) (providing for a BOL level of either 22 or 20 when the defendant has only one qualifying prior conviction, depending on the nature of the firearm involved in the § 922(g) offense).

The District Court next adjusted Abdulaziz's total offense level downward due to his timely acceptance of

responsibility.  See U.S.S.G. § 3E1.1(a), (b).  After accounting for Abdulaziz's criminal history category, which it determined to be VI, the District Court calculated his GSR to be 77 to 96 months of imprisonment.  The District Court at that point determined that Abdulaziz was eligible for a departure pursuant to § 4A1.3(b) of the Guidelines.[1]  The departure resulted in a recalculated GSR of 57 to 71 months of imprisonment.  The District Court ultimately sentenced Abdulaziz to a sixty-month prison term to be followed by three years of supervised release.

Judgment was entered on September 26, 2019.  Abdulaziz timely appealed on October 7, 2019.

**II.**

Abdulaziz contends that his sentence cannot stand because his July 2014 Massachusetts conviction for possession with intent to distribute "Marihuana," Mass. Gen. Laws ch. 94C, §§ 31, Class D(b)(1), 32C(a) (effective July 1, 2014), does not qualify as a conviction of "a controlled substance offense" under § 2K2.1(a)(2).

Setting aside for the moment the question of what criteria the guideline uses to determine what constitutes what it

---

[1] The District Court reasoned that, in light of the age of some of Abdulaziz's prior convictions and the lack of recent serious offenses, "he's more properly classified in criminal history category IV" and thus it "depart[ed] from criminal history category VI to criminal history category IV."

terms "a controlled substance offense," we note that there is no disagreement between the parties that this guideline requires that we apply the categorical approach to determine whether Abdulaziz's July 2014 Massachusetts conviction was of "a controlled substance offense" within the meaning of § 2K2.1(a)(2). In consequence, we "look only to the elements" of the Massachusetts law offense underlying that conviction and "not to 'how [Abdulaziz] actually perpetrated the crime to decide if the offense, as defined in the statute, matches [the guideline's] criteria' for a 'controlled substance offense.'" United States v. Capelton, 966 F.3d 1, 6 (1st Cir. 2020) (quoting United States v. García-Cartagena, 953 F.3d 14, 18 (1st Cir. 2020)).

We also note that there is no disagreement between the parties that, at the time of Abdulaziz's July 2014 conviction for that "Marihuana"-related offense, Massachusetts defined "Marihuana" to include hemp. See Mass. Gen. Laws ch. 94C, § 1 (effective July 1, 2014) (defining "Marihuana" as "all parts of the plant Cannabis sativa L., whether growing or not," except for "the mature stalks of the plant, fiber produced from the stalks, oil, or cake made from the seeds of the plant"). Accordingly, the parties agree that Abdulaziz's July 2014 conviction must be understood to be a conviction for possession with the intent to distribute hemp even though the record does not establish whether Abdulaziz actually perpetrated that crime by possessing that

substance. See Moncrieffe v. Holder, 569 U.S. 184, 190-91 (2013) (explaining that under the categorical approach a court is to look to "the least of the acts" criminalized by the statute of conviction (alteration omitted) (quoting Johnson v. United States, 559 U.S. 133, 137 (2010)).

With this foundation in place, we have but one question to decide to resolve this appeal: is a conviction of such a hemp-based offense a conviction of "a controlled substance offense" within the meaning of § 2K2.1(a)(2)? As that question necessarily turns on the proper interpretation of the Guidelines, our review is de novo. See Capelton, 996 F.3d at 5.

**A.**

"[W]e ordinarily employ the Guidelines in effect at sentencing," rather than the Guidelines in effect either at the time of the defendant's conviction of the offense for which he is being sentenced or at any earlier time. United States v. Rodriguez, 630 F.3d 39, 42 (1st Cir. 2010) (alteration omitted) (quoting United States v. Maldonado, 242 F.3d 1, 5 (1st Cir. 2001)); see 18 U.S.C. § 3553(a)(4)(A)(ii). We follow that course here, and, indeed, no party asks us to do otherwise. We thus must decide what the term "controlled substance offense" in the § 2K2.1(a)(2) guideline meant as of the time of Abdulaziz's § 922(g) sentencing.

The text of § 2K2.1(a)(2) at that time did not purport to define the term "controlled substance offense," just as it does not purport to do so now.  See U.S.S.G. §§ 2K2.1(a)(2).  But, it did refer at that time -- as now -- to another guideline, § 4B1.2(b), that did define that term.  See id. §§ 2K2.1(a)(2) & cmt. n.1, 4B1.2(b).  And, that guideline defined "controlled substance offense" at that time -- as now -- as an "offense" that, among other things, "prohibits the . . . possession of [with intent to distribute] a controlled substance."  U.S.S.G. § 4B1.2(b) (emphasis added).  Moreover, the government agrees with Abdulaziz (given the arguments that it has timely made to us) that a "controlled substance" in § 4B1.2(b) was defined as of that time by reference to whether a substance was either included in or excluded from the drug schedules set forth in the federal Controlled Substances Act ("CSA").[2]  See 21 U.S.C. § 812; 21 C.F.R. §§ 1308.11-1308.15.  Thus, insofar as the CSA's drug schedules were incorporated into the guideline itself at the time of

_____

[2] The government filed a response to a Rule 28(j) letter after briefing was complete in this case in which it took the position for the first time that "the term 'controlled substance' in USSG § 4B1.2 [does not] refer[] exclusively to the federal controlled substance[s]" listed in the CSA's drug schedules.  We decline to address such a late-breaking contention about the criteria that the Guidelines use to define what constitutes a "controlled substance."  See Rosa-Rivera v. Dorado Health, Inc., 787 F.3d 614, 617 (1st Cir. 2015) ("Not only is it improper to advance new arguments in a 28(j) letter, but it is far too late in the game." (citation omitted)).

Abdulaziz's § 922(g) sentencing, it would appear that the answer to our question is fairly straightforward: we must look to the version of those drug schedules that were "in effect" at that time, Rodriguez, 630 F.3d at 42, to determine what constituted a "controlled substance," U.S.S.G. § 4B1.2(b), at that time.

To be sure, the CSA's drug schedules do, by design, change over time. See 21 U.S.C. §§ 811(a), 812(a) ("There are established five schedules of controlled substances . . . [which] shall initially consist of the substances listed in this section," but "the Attorney General may by rule" "add" "or" "remove any drug or other substance from the schedules [provided that certain findings are made]." (emphasis added)). And that does mean that, insofar as § 4B1.2(b) incorporated the CSA's drug schedules as of the time of Abdulaziz's § 922(g) sentencing, what constituted a "controlled substance" in that guideline as of that time might differ from what constituted a "controlled substance" as of the time of one of his prior "felony convictions." U.S.S.G. §§ 2K2.1(a)(2), 4B1.2(b).

But, of course, the Guidelines themselves are not fixed in stone, and yet we ordinarily must apply the version of them that is in effect at the time of the defendant's sentencing for his conviction of the offense that occasioned it. See Rodriguez, 630 F.3d at 42; 18 U.S.C. § 3553(a)(4)(A)(ii). Thus, the fact that the CSA drug schedules vary over time does not itself suggest

a reason for us to look to a version of those schedules that is different from the one that was in effect at the time of the § 922(g) sentencing to determine what constituted a "controlled substance" -- and thus what constituted a "controlled substance offense" -- under § 2K2.1(a)(2) as of the time of that sentencing.

Nonetheless, the government contends that the text of § 2K2.1(a)(2) must be read to require that we look to the version of the CSA's drug schedules that was in place at some time prior to the time of the § 922(g) sentencing to discern what that guideline deemed to be a "controlled substance" as of the time of that sentencing. Specifically, the government contends that the words "felony conviction[]" and "subsequent to sustaining" in § 2K2.1(a)(2) combine to require that the meaning of "controlled substance," even as of the time of the § 922(g) sentencing, must be drawn from the version of the CSA's drug schedules that was in place at the time of either (1) Abdulaziz's commission of the § 922(g) offense in September of 2018, or (2) Abdulaziz's sustaining of the hemp-related Massachusetts conviction in July of 2014, and thus not from the version of those schedules that was in effect when he was later sentenced for his § 922(g) conviction.

From that premise, the government then goes on to contend that Abdulaziz's July 2014 Massachusetts conviction necessarily was of "a controlled substance offense" within the meaning of § 2K2.1(a)(2) as of the time of his § 922(g) sentencing, even

though the CSA's drug schedules did not include hemp at the time of that sentencing. See Agriculture Improvement Act of 2018, Pub. L. No. 115-334, § 12619, 132 Stat. 4490, 5018 (effective Dec. 20, 2018) (codified as amended at 21 U.S.C. § 802(16)(B)) (providing that "[t]he term 'marihuana' does not include" "hemp"). And that is because, the government correctly points out, the CSA's drug schedules in effect at each of those earlier times (July 2014 and September 2018) did include hemp. See 21 U.S.C. § 812, Sched. I(c)(10) (2012, effective through Dec. 19, 2018); id. § 802(16) (2009, effective through Dec. 17, 2014); id. (2016, effective through Oct. 23, 2018). For the reasons that we will next explain, however, we do not agree with the government's construction of § 2K2.1(a)(2), under which CSA drug schedules not in effect at the time of a defendant's § 922(g) sentencing would determine the meaning of "a controlled substance offense" in that guideline as of the time of that sentencing.

**B.**

We begin with the guideline's text and the specific words in it that the government contends support the construction that it advances. We note, however, that those words do not expressly require such a backward-looking, time-of-prior-conviction or time-of-commission-of-§ 922(g)-offense approach to discerning the meaning of the term "controlled substance offense" in § 2K2.1(a)(2). The guideline does not refer, for example, to "what

- 11 -

at the time of the § 922(g) offense was considered a controlled substance offense" or, alternatively, to "what at the time of the prior conviction was considered a controlled substance offense."

Nor must the words that the government places such weight on be understood to make such a specification for them to be doing any work at all. Whether or not we construe "a controlled substance offense" to be defined by reference to the version of § 4B1.2(b) in effect at the time of the § 922(g) sentencing, the earlier clause in § 2K2.1(a)(2) would still usefully establish that under that guideline the "felony convictions" must have been "sustain[ed]" before the § 922(g) offense was "committed." U.S.S.G. § 2K2.1(a)(2); cf. United States ex rel. Banigan v. PharMerica, Inc., 950 F.3d 134, 143 n.11 (1st Cir. 2020) (explaining that "courts, whenever possible, [attempt] to give meaning to every word and phrase contained in the text of a statute" (quoting United States ex rel. Ondis v. City of Woonsocket, 587 F.3d 49, 58 (1st Cir. 2009))).

To be sure, the word "conviction[]" in § 2K2.1(a)(a) does require us to look back to the time of a conviction -- rather than to the time of the § 922(g) sentencing itself -- to discern the elements of, and the penalties attached to, the offense that underlies it, so that we may then determine whether the "conviction[]" is a "felony conviction[]" of "a controlled substance offense" as of the time of that sentencing. U.S.S.G.

- 12 -

§ 2K2.1(a)(2). That much is clear from McNeill v. United States, 563 U.S. 816 (2011), on which the government heavily relies.

But, the word "conviction[]" in the guideline is not the word that matters here, given that we are trying to identify this guideline's criteria for what constitutes "a controlled substance offense." Nor does McNeill suggest otherwise.

In McNeill, the Supreme Court considered a provision in the Armed Career Criminal Act ("ACCA") that imposed a sentencing enhancement for a § 922(g) offender who had three or more "previous convictions" of "a serious drug offense." 18 U.S.C. § 924(e)(1); see McNeill, 563 U.S. at 818-19. The Court held that the "plain text" of the words "previous conviction" compelled the conclusion that the elements of and penalties attached to the offense underlying a "previous conviction" were locked in as of the time of that "conviction." McNeill, 563 U.S. at 820. Thus, the Court held, ACCA's plain text required the sentencing judge to decide whether a "previous conviction" of an offense with those time-of-conviction characteristics qualified as a "previous conviction" of "a serious drug offense" in determining whether the enhancement set forth in ACCA applied. Id. at 820-22.

It is clear, as the Sixth Circuit recently observed, that "McNeill expresses the principle that the elements of the state offense of conviction are locked in at the time of that conviction." United States v. Williams, No. 19-6410, 2021 WL

- 13 -

1149711, at *6 (6th Cir. Mar. 25, 2021) (unpublished); see also Boulanger v. United States, 978 F.3d 24, 30 n.6 (1st Cir. 2020) ("Congress intended courts to use the 'historical statute of conviction' when analyzing ACCA cases, not a modern, amended version" (quoting McNeill, 563 U.S. at 822)). That is why, consistent with the categorical approach, we look to the elements of the Massachusetts law "Marihuana" offense of which Abdulaziz was convicted in July 2014, Mass. Gen. Laws ch. 94C, §§ 31, Class D(b)(1), 32C(a) (effective July 1, 2014), as Massachusetts law described those elements at the time of that conviction to determine the characteristics of the offense underlying it.

But, in making that much clear, McNeill did not also hold that ACCA's own criteria for deeming a "previous conviction[]" with those locked-in characteristics to be "a serious drug offense," 18 U.S.C. § 924(e)(2)(A) (emphasis added), were themselves also locked in as of the time of the "previous conviction[]." In fact, McNeill simply had no occasion to address that question, because there had been no relevant change in that case to those criteria -- which included in part a requirement that such a conviction carry "a maximum term of imprisonment of ten years or more," id. -- between the time of the McNeill defendant's "previous conviction[]" and the time of his § 922(g) sentencing, such as through an amendment during that period to ACCA itself, see McNeill, 563 U.S. at 817-19; Career Criminals

- 14 -

Amendment Act of 1986, Pub. L. No. 99-570, § 1402, 100 Stat. 3207, 3207-39 to -40 (codified as amended at 18 U.S.C. § 924(e)(2)).[3]

In this appeal, of course, the only question that is in dispute is the one that is analogous to the question that the Court in McNeill did not have any occasion to answer -- namely, are § 2K2.1(a)(2)'s criteria for deeming a "felony conviction[]" to be of "a controlled substance offense" locked in at the time of that "conviction[]"? That question is analogous to the question of what ACCA's criteria were for determining what constituted "a serious drug offense." And thus, as the Ninth Circuit recognized when faced with the same question concerning the criteria that this guideline uses to determine whether a prior conviction is a qualifying "controlled substance offense" that we now confront, it is a question that "bears little resemblance to the [question

---

[3] Another of ACCA's criteria for deeming a prior state conviction to be of "a serious drug offense" included that such a conviction must "involv[e] manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))." 18 U.S.C. § 924(e)(2)(A)(ii). But, there had been no relevant intervening change to the meaning of "controlled substance" in this provision, as the defendant in McNeill had six prior North Carolina convictions for either selling cocaine or possessing with intent to sell cocaine, see McNeill, 563 U.S. at 818-19, and the defendant did not contend (nor did he have any basis for contending) that at any relevant time "cocaine" was not a "controlled substance" under the CSA's drug schedules and thus under § 924(e)(2)(A)(ii). The McNeill Court thus had no occasion to address whether the ACCA enhancement could validly be applied to him if "cocaine" were no longer a "controlled substance" within the meaning of § 924(e)(2)(A)(ii) at the time of sentencing.

- 15 -

posed] in <u>McNeill</u>." <u>United States</u> v. <u>Bautista</u>, 989 F.3d 698, 703 (9th Cir. 2021); <u>see also</u> <u>Williams</u>, 2021 WL 1149711, at \*6 (similar).[4]

_____

[4] In a 28(j) letter filed on May 26, 2021 acknowledging <u>Williams</u>, the government points to the concurrence in that case, which concludes that "<u>McNeill</u>'s approach controls here" and that "the overwhelming trend of appellate decisions all point to applying sentencing enhancements using a time-of-conviction rule." <u>Williams</u>, 2021 WL 1149711, at \*9-10 (Cook, J., concurring) (collecting cases). But, the decisions that the concurrence cites reflect only <u>McNeill</u>'s principle that the elements of and penalties attached to a "conviction" are locked in as of the time of that "conviction" and thus, like <u>McNeill</u>, have little to do with the question posed here. <u>See</u> <u>United States</u> v. <u>Doran</u>, 978 F.3d 1337, 1340 (8th Cir. 2020) (holding that it is "a 'backward looking' question . . . whether a prior conviction was punishable as a felony at the time of the conviction" (cleaned up) (quotation omitted)); <u>United States</u> v. <u>Bermudez-Zamora</u>, 788 F. App'x 523, 524 (9th Cir. 2019) (holding that state's post-conviction "reclassification" of prior conviction from felony to misdemeanor did not change the "historical fact" that, for purposes of applying a Guidelines enhancement, it was "a conviction for a felony offense . . . for which the sentence imposed was five years or more," U.S.S.G. § 2L1.2(b)(3)(A) (quotations omitted)); <u>United States</u> v. <u>Sanders</u>, 909 F.3d 895, 904 (7th Cir. 2018) (holding that "for purposes of applying [a statutory] recidivist enhancement [predicated on whether a prior conviction was a 'felony'], it is immaterial whether a defendant's state felony conviction was reclassified as a misdemeanor after she" sustained it); <u>United States</u> v. <u>Turlington</u>, 696 F.3d 425, 427-28 (3d Cir. 2012) (holding that a court must look to the penalties attached to "the underlying offense as [they previously] existed" when applying statutory provision that asks whether "the maximum term of imprisonment authorized" for that offense was "life imprisonment," 18 U.S.C. § 3559(e)); <u>United States</u> v. <u>Mazza</u>, 503 F. App'x 9, 11 (2d Cir. 2012) (rejecting contention that a state's "decriminaliz[ation]" of conduct underlying prior conviction which occurred "<u>after</u> [the defendant's] conviction ha[d] become final" affected his Guidelines criminal history category, given that "criminal history categories are based on the maximum term imposed in previous sentences" (quotation omitted)); <u>United States</u> v. <u>Moss</u>, 445 F. App'x 632, 635 (4th Cir. 2011) ("we find no merit in Moss's

In addition to this distinction between the question that we must answer in this case and the question that the Court confronted in McNeill, there is another reason why the government's reliance on McNeill here is misplaced. The explanation that McNeill gave for concluding that the words "previous conviction[]" in ACCA plainly required a backward-looking inquiry into the elements of and penalties attached to the prior offense at the time of its commission, see 563 U.S. at 820-23, simply does not bear on the answer to the interpretive question that we confront here concerning the meaning of "a controlled substance offense" in § 2K2.1(a)(2).

Consider that, in reading "previous conviction[]" to require such a backward-looking inquiry, McNeill emphasized how strange it would be to treat a defendant as having been convicted of an offense the elements of and penalties for which would become known to him only upon his sentencing for his conviction of an entirely different offense that he had subsequently committed. See id. at 821 ("Although North Carolina courts actually sentenced

_____

contention that his 1992 breaking and entering conviction was not a 'serious violent felony' because that crime is now punishable by a maximum term of less than ten years," given that "the maximum term of incarceration at the time of Moss's conviction was ten years"); Mallett v. United States, 334 F.3d 491, 504 (6th Cir. 2003) (deeming "implausible" an interpretation of the Guidelines which would require determining "the maximum term of imprisonment" for a "state-court conviction" "as of any time other than the date on which the defendant's guilt is established").

[McNeill] to 10 years in prison for his drug offenses, McNeill now contends that the 'maximum term of imprisonment' for those offenses is 30 or 38 months. We find it 'hard to accept the proposition that a defendant may lawfully have been sentenced to a term of imprisonment that exceeds the maximum term of imprisonment prescribed by law.'" (cleaned up) (quoting United States v. Rodriquez, 553 U.S. 377, 383 (2008))). But, there is nothing similarly strange about looking to federal law as it exists at the time of a defendant's federal sentencing to determine the criteria that a potentially applicable federal sentencing enhancement uses to determine whether the enhancement must be applied at that sentencing. Indeed, ordinarily, that is precisely where we would look to identify those criteria. See Bautista, 989 F.3d at 703 ("McNeill nowhere implies that the court must ignore current federal law and turn to a superseded version of the United States Code" to expound "federal sentencing law [as it] exists at the time of sentencing.").

True, a § 922(g) defendant's past criminal conduct involving a substance that the CSA's drug schedules classified at that earlier time as "controlled" could suggest a reason to be concerned that the defendant is especially defiant of law and thus a reason to find the earlier classification of the substance by those schedules potentially relevant to the sentence that the defendant should receive for his § 922(g) conviction. But, that

- 18 -

observation does not itself support the conclusion that the § 2K2.1(a)(2) guideline must be read to require us to look to federal drug schedules not in effect at the time of the § 922(g) sentencing to discern the meaning of what constitutes a "controlled substance" and thus "a controlled substance offense" under that guideline as of the time of that sentencing.

A guideline's enhancement for a defendant's past criminal conduct -- such as the enhancement that § 2K2.1(a)(2) imposes -- is reasonably understood to be based in no small part on a judgment about how problematic that past conduct is when viewed as of the time of the sentencing itself. Cf. Taylor v. United States, 495 U.S. 575, 581-85 (1990) (noting that the drafters of ACCA's enhancement intended it to capture prior crimes which "are inherently dangerous" and constitute "the most damaging crimes to society" (quotations omitted)). There is thus reason to be wary of a construction of § 2K2.1(a)(2) that would require a judge at sentencing to apply an enhancement in consequence of the defendant's past conduct that itself applies only insofar as that past conduct involves a substance that is "controlled" without regard to whether the conduct in fact involved a substance that, so far as the CSA's drug schedules in effect at the time of that sentencing indicate, is "controlled." Cf. H.R. Rep. 115-1072, at 695 (2018) (Conf. Rep.) (describing "hemp" as an "agricultural crop[] having strategic and industrial importance"); cf. also 164

- 19 -

Cong. Rec. 4,459-60 (2018) (remarks of Sen. McConnell) ("Hemp is in everything from health products to home insulation" and "is a completely different plant from its illicit cousin. . . . Hemp will be a bright spot for our future."); 164 Cong. Rec. 4,494 (2018) (remarks of Sen. Bennett) ("We forget, but hemp was widely grown in the United States throughout the mid-1800s. Americans used hemp in fabrics, wine, and paper. Our government treated industrial hemp like any other farm commodity until the early 20th century, when a 1937 law defined it as a narcotic drug, dramatically limiting its growth. This became even worse in 1970 when hemp became a schedule I controlled substance. . . . [W]e see hemp as a great opportunity to diversify our farms and manufacture high-margin products for the American people.").

The reason to be wary of embracing a construction of the guideline that would have such a consequence is especially strong when one remembers that the enhancement the guideline sets forth is not the sole means by which a prior conviction for that conduct could impact the calculation of the defendant's GSR. For example, that conviction could bear on the defendant's criminal history score even if it does not qualify as one of an offense that is deemed to be a qualifying one under the enhancement set forth in § 2K2.1(a)(2). See U.S.S.G. § 4A1.1(a)-(c); ch. 5, pt. A (sentencing table). And, of course, the Guidelines themselves are not binding on the sentencing judge, who has broad discretion

- 20 -

to take account of relevant considerations in setting the defendant's ultimate sentence. See Rita v. United States, 551 U.S. 338, 347-51 (2007); United States v. Benoit, 975 F.3d 20, 24 (1st Cir. 2020).

The government does also contend that it would be "illogical and unfair" to subject a defendant to the enhancement that § 2K2.1(a)(2) sets forth simply because of the happenstance of the timing of his § 922(g) sentencing. It notes in this regard that under a time-of-§ 922(g)-sentencing construction of this guideline, two defendants who had been convicted of the same offense and had the same criminal history could be treated differently just because of that quirk of timing.[5]

But, this kind of differential treatment between otherwise similarly situated defendants often arises when courts apply -- as they ordinarily must -- the Guidelines that are operative at the time of sentencing. See 18 U.S.C. § 3553(a)(4)(A)(ii) (directing courts to apply the Guidelines that "are in effect on the date the defendant is sentenced"); see, e.g., Williams, 2021 WL 1149711, at *6 n.4 ("[T]wo similarly situated

---

[5] We note that keying the definition of "controlled substance" to the federal drug schedules in effect at the time of the commission of the § 922(g) offense would create its own potential "disparity," as the timing of the commission of that offense might then be determinative of whether a defendant's prior felony conviction results in the enhancement, even though the underlying prior conviction would be the same irrespective of when the § 922(g) offense was committed.

defendants c[an] receive different federal sentences depending on if they are sentenced the day before or after the Sentencing Commission changes a Guidelines provision." (citing United States v. Horn, 612 F.3d 524, 526-27 (6th Cir. 2010))). Indeed, the government conceded at oral argument that, if § 4B1.2(b) expressly provided that a "controlled substance" meant only "heroin or cocaine" at the time of a defendant's § 922(g) sentencing, that defendant's prior state law conviction for possession of "marihuana" could not be deemed "a controlled substance offense" under § 2K2.1(a)(2) just because a no-longer-operative version of § 4B1.2(b) in effect at the time of that prior conviction expressly defined a "controlled substance" more expansively to include either "heroin, cocaine, or marihuana." Cf. United States v. Nickles, 249 F. Supp. 3d 1162, 1163-64 (N.D. Cal. 2017) (applying, in the course of "determin[ing] that defendant's prior conviction for robbery [from 2009] does not qualify as a crime of violence," the "narrow[er] . . . definition of extortion" set forth in an August 1, 2016 amendment to the Guidelines to the benefit of a defendant sentenced after that date), aff'd, 735 F. App'x 450 (9th Cir. 2018). Yet, the very same differential treatment between defendants that the government suggests is "illogical and unfair" would occur in that event, and we fail to see a meaningful difference between that hypothetical guideline and this one.

## C.

The government's remaining argument relies on precedents that do not concern the proper construction of sentencing enhancements at all. Here, the government relies chiefly on Mellouli v. Lynch, 575 U.S. 798 (2015), in which the Supreme Court addressed the proper construction of a federal immigration measure which authorizes the removal of "[a]ny alien . . . convicted of a violation of . . . any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21)." 8 U.S.C. § 1227(a)(2)(B)(i) (emphasis added).

The Court in Mellouli looked (in a manner consistent with McNeill) to the Kansas drug schedules from the time of the petitioner's previous Kansas conviction to determine what "controlled substance[s]" the "elements" of that "conviction" might be said to "relate to." 575 U.S. at 812-13; see id. at 802 ("At the time of Mellouli's conviction, Kansas' schedules included at least nine substances not included in the federal lists" (emphasis added) (citing, inter alia, Kan. Stat. Ann. §§ 65-4105(d), 65-4113(d)-(f) (2010 Cum. Supp.)). But, much like in McNeill, the Court did not consider -- because it had no occasion to consider -- the issue of what temporal version of the federal drug schedules was relevant in determining the answer to the question that is analogous to the one presented here: what

- 23 -

constitutes a "controlled substance" under 8 U.S.C. § 1227(a)(2)(B)(i). After all, neither party in Mellouli contended that the federal drug schedules had expanded or contracted in any material way between the time of Mellouli's 2010 Kansas conviction and his removal proceedings in 2012.

Insofar as Mellouli may be said to touch on that issue, moreover, it tends, if anything, to undermine the government's position here. For example, the Court in Mellouli cited to a footnote in the government's brief to support the conclusion that some of the substances on the 2010 Kansas schedules were "not included in the federal lists," 575 U.S. at 802 (citing Respondent's Brief at 9 n.2), and that footnote in turn relied on U.S. Drug Enforcement Administration documents from 2013 -- a date which fell after both the 2010 Kansas conviction was sustained and after Mellouli's removal proceedings had terminated -- to explain that certain substances on the 2010 Kansas drug schedules, such as Salvia Divinorum and Jimson Weed, were "not identifiable as federally controlled substances," Respondent's Brief at 8-9, 9 n.2, Mellouli v. Lynch, 575 U.S. 798 (2015) (No. 13-1034), 2014 WL 6613094, at *8-9 & 9 n.2. In addition, Mellouli noted that the actual substance involved in Mellouli's arrest, Adderall, "is a controlled substance under . . . federal law." 575 U.S. at 803 (emphasis added) (citing 21 C.F.R. § 1308.12(d)(1) (2014)).

We do recognize that the Second Circuit later held in _Doe_ v. _Sessions_, 886 F.3d 203 (2d Cir. 2018), that this same federal immigration measure -- § 1227(a)(2)(B)(i) -- must be read to make "time-of-[prior-]conviction" federal drug schedules relevant rather than those "in force when removal proceedings are initiated." _Id._ at 209. The Second Circuit reasoned that reading "'works to promote . . . predictability in the administration of immigration law,'" _id._ (quoting _Mellouli_, 575 U.S. at 806),[6] because otherwise a previously-convicted "alien could . . . become removable by the time removal proceedings [are] commenced" if the CSA schedules after the prior conviction is sustained are "expanded to encompass the same drugs as [the prior conviction]," _id._ at

---

[6] In the portion of _Mellouli_ here relied on by the Second Circuit, the Supreme Court explained that the categorical approach was preferable to a conduct-based one because of the "predictability" that it engenders, noting that the categorical approach "enables aliens 'to anticipate the immigration consequences of guilty pleas in criminal court.'" 575 U.S. at 806 (quoting Jennifer Lee Koh, _The Whole Better than the Sum: A Case for the Categorical Approach to Determining the Immigration Consequences of Crime_, 26 Geo. Immigr. L. J. 257, 307 (2012)); _see also_ Koh, _supra_, at 307 ("By emphasizing statutory language and fixed evidentiary rules, the categorical approach permits the existence of 'safe harbor' pleas, which do not expose the immigrant to the risk of immigration sanctions."). But, the predictability that _Mellouli_ was concerned with in that discussion was the predictability that flows from the categorical approach itself, _see_ 575 U.S. at 806, and not the predictability that comes from interpreting a statutory definition that refers to the federal controlled substance lists to refer to those lists only as they exist at the time of any given prior conviction. Thus, it is far from clear that _Mellouli_'s discussion of "predictability" militates in favor of the Second Circuit's construction of the federal immigration measure at issue in that case.

210. <u>Doe</u> thus concluded that it made sense to construe the federal immigration measure in a manner that would provide "the alien with maximum clarity at the point at which it is most critical for an alien to assess (with aid from his defense attorney) whether 'pending criminal charges may carry a risk of adverse immigration consequences.'" <u>Id.</u> (quoting <u>Padilla</u> v. <u>Kentucky</u>, 559 U.S. 356, 369 (2010)).

But, there is no similar concern in this context given both the gap in time that necessarily exists between the prior conviction and any consequence under § 2K2.1(a)(2) that is attributable to it and the highly contingent nature of that consequence, as it results only if a defendant commits a new crime. Thus, even if we were to assume that <u>Doe</u>'s construction of the federal measure at issue in that case is reconcilable with <u>Mellouli</u>, we are not persuaded by the government's contention that <u>Doe</u> supports its position here.[7]

---

[7] The remaining lower court immigration decisions cited by the government do not speak -- let alone persuasively -- to the issue of how, temporally, to understand the criteria employed by § 2K2.1(a)(2) to determine whether a prior conviction is "a controlled substance offense." Instead, those decisions either fail to present any timing issue whatsoever, <u>see</u> <u>Collymore</u> v. <u>Lynch</u>, 828 F.3d 139 (2d Cir. 2016), or appear to rest largely on a misinterpretation of <u>Mellouli</u>, <u>see</u> <u>Martinez</u> v. <u>Att'y Gen.</u>, 906 F.3d 281, 287 (3d Cir. 2018).

**D.**

In sum, hemp was not on the CSA's drug schedules when Abdulaziz was sentenced on account of his § 922(g) offense in September of 2019.  See Agriculture Improvement Act § 12619.  That means, given the government's timely arguments to us, that hemp was not a "controlled substance" within the meaning of the version of § 4B1.2(b) that was in effect at the time of Abdulaziz's sentencing and, by extension, § 2K2.1(a)(2) as of that same time.  Accordingly, Abdulaziz's July 2014 Massachusetts conviction was not a conviction of "a controlled substance offense" within the meaning of that term as it was used in the version of § 2K2.1(a)(2) that was applicable at his sentencing.

**III.**

The sentence is **vacated** and the case is **remanded** for further proceedings consistent with this opinion.[8]

---

[8] Insofar as we hold that Abdulaziz's July 2014 Massachusetts conviction was not "a controlled substance offense" within the meaning of § 2K2.1(a)(2), the government asks that the District Court be allowed in the first instance to determine whether Abdulaziz's 2018 Massachusetts conviction for unarmed assault with intent to rob separately qualifies as "a crime of violence" under that guideline, such that the application of the enhancement might be justified on that basis.  The District Court at Abdulaziz's initial sentencing hearing observed, in line with the government's sentencing memorandum, that the government was "not arguing" that this 2018 conviction was a qualifying "crime of violence."  We express no opinion as to whether the question of that prior conviction's qualifying nature can be revisited during Abdulaziz's resentencing in the event the government were to ask the District Court to revisit it.