FILED
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**September 8, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

GREGORY YARNELL WILLIAMS,

    Defendant - Appellant.

No. 21-6061

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:20-CR-00149-PRW-1)**
_____

Laura K. Deskin, Research & Writing Specialist (Susan M. Otto, Federal Public Defender, with her on the briefs), Office of the Federal Public Defender, Western District of Oklahoma, Oklahoma City, Oklahoma, for Defendant-Appellant

Jason M. Harley, Assistant United States Attorney (Robert J. Troester, United States Attorney with him on the brief), Office of the United States Attorney, Western District of Oklahoma, Oklahoma City, Oklahoma, for Plaintiff-Appellee.
_____

Before **TYMKOVICH**, Chief Judge, **BALDOCK** and **ROSSMAN**, Circuit Judges.
_____

**ROSSMAN**, Circuit Judge.
_____

Gregory Yarnell Williams appeals his sentence after pleading guilty to possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841 and being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). He

raises two claims of error. First, Mr. Williams contends his sentence is procedurally unreasonable because the district court incorrectly calculated his base offense level under the advisory Sentencing Guidelines. Mr. Williams claims the district court clearly erred in its drug-quantity calculation by holding him accountable for alleged packages of methamphetamine on which the government presented no evidence. Second, he asserts the district court imposed an illegal sentence by erroneously applying the Armed Career Criminal Act (ACCA) enhancement. According to Mr. Williams, his prior Oklahoma convictions for distributing a controlled dangerous substance were not categorically "serious drug offenses" under 18 U.S.C. § 924(e)(2)(A)(ii) because his state offenses applied to hemp, and hemp was not a federally controlled substance at the time of his federal offense.

We agree with Mr. Williams on both issues. We vacate the judgment and remand for resentencing.

## I.    Background

### A. Factual Background

In May 2020, the U.S. Postal Inspection Service (USPIS) flagged a Priority Mail Express package addressed to 104 SE 39th Street in Oklahoma City. USPIS identified the package as suspicious because it was shipped from San Bernardino, California, a known source area of controlled substances, and the sender/recipient names were not associated with the listed addresses. Investigators from USPIS provided surveillance as the package was delivered to the 39th Street address. They

observed a man later identified as Mr. Williams pick up the package and leave the residence in an SUV about 40 minutes later.

On June 2, 2020, investigators intercepted another suspicious Priority Mail Express package mailed from San Bernardino to the 39th Street address. A drug dog indicated the package contained narcotics. After obtaining a search warrant, investigators opened the package, found suspected methamphetamine in vacuum-sealed bundles, and then repackaged it for delivery.

On June 3, the package was delivered to the 39th Street address under surveillance. Upon delivery, law enforcement officers saw Mr. Williams take the package into the house and, shortly thereafter, leave in his SUV. Officers stopped the SUV, arrested Mr. Williams, and found him in possession of about $1,800 in cash. Pursuant to a warrant, officers searched the 39th Street address and found the resealed package, two scales, a heat sealer, a surveillance system, and a loaded revolver. They also found an empty package from San Bernardino dated April 22, 2020.

Subsequent testing showed the package delivered on June 3 contained 1,720.54 grams of a substance containing methamphetamine with a purity level of 71%. Thus, it contained approximately 1,222 grams of actual methamphetamine.

## B. Procedural Background

A grand jury indicted Mr. Williams on three counts: (1) possession with intent to distribute 500 grams or more of a mixture or substance containing methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A); (2) maintaining a

drug-involved premises in violation of 21 U.S.C. § 856(a)(1); and (3) felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Mr. Williams pled guilty without a plea agreement to counts one and three.

### 1. The Presentence Report and Objections

According to the presentence investigation report (PSR), investigators reviewed United States Postal Service (USPS) records and concluded that, between January 6 and June 1, 2020, seven parcels ranging in weight from about one to five pounds were delivered to the 39th Street residence from California, in addition to the package intercepted on June 3. The 39th Street residence belongs to Mr. Williams' brother. Mr. Williams lived with his common-law wife at 1312 NE 19th Street in Oklahoma City. Investigators determined similar parcels from California had been mailed directly to Mr. Williams' residence on April 29, May 22, and May 28, 2020—specifically three packages weighing three pounds each.

The PSR determined the applicable guideline for Mr. Williams' drug count was U.S.S.G. § 2D1.1. Under that guideline, the base offense level is driven by the type and quantity of drugs involved in the offense, *id.* § 2D1.1(a)(5), (c), including all relevant conduct, *id.* cmt. n.5 ("Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level." (citing U.S.S.G. § 1B1.3(a)(2) (Relevant Conduct))). To calculate drug quantity, the PSR started with the 1,222 grams of actual methamphetamine recovered on June 3 from the package intercepted at the 39th Street address. It then added the three packages mailed to Mr. Williams' house at 19th Street. Importantly, as we will explain, the

4

PSR disclaimed reliance on the seven other packages mailed to the 39th Street address. The PSR concluded "there was insufficient information to determine that the additional [seven] parcels mailed to the [39th Street] residence contained narcotics attributable to the defendant." R. vol. 2 at 12. The 1,222 grams of actual methamphetamine equaled 24,440 kilograms of converted drug weight; the other 9 pounds, or 4.08 kilograms, equaled 8,160 kilograms for a total converted drug weight of 32,600 kilograms.[1] That total amount of converted drug weight—at least 30,000 kilograms—set Mr. Williams' base offense level at 36. *See* § 2D1.1(c)(2). After applying two enhancements, the PSR determined Mr. Williams' total offense level on count one was 40.

As to count three, the § 922(g) violation, the PSR determined a cross-reference to the drug guideline was applicable. Thus, the total offense level from the drug count, 40, also applied to count three.

The PSR reported Mr. Williams' criminal history, including three prior Oklahoma convictions for possession with intent to distribute a controlled dangerous substance in 1996, 1997, and 2003. According to the PSR, each of these convictions was a "serious drug offense" under § 924(e)(2)(A)(ii) and therefore Mr. Williams was subject to an enhanced sentence under the ACCA. The enhancement increased the statutory range on his § 922(g) conviction from 0-10 years of imprisonment to 15

---

[1] One gram of actual methamphetamine equals 20 kilograms of converted drug weight; one gram of a substance containing methamphetamine equals 2 kilograms of converted drug weight. § 2D1.1 cmt. n.8(D).

years to life imprisonment. *Id.* § 924(e)(1). However, it did not affect his total offense level under the Guidelines.

Before sentencing, Mr. Williams objected to the PSR's drug-quantity calculation. Mr. Williams specifically contested the PSR's reliance on the three packages sent to his residence on 19th Street. He disputed these packages contained methamphetamine, and even if they did, he contended the weights determined by the PSR overestimated drug quantity because they failed to account for packaging material. Recall, the PSR had disclaimed reliance on the seven packages mailed to the 39th Street address. According to Mr. Williams, counting only the package actually intercepted on June 3 and not the weight from the three contested packages sent to his residence, the base offense level should be 34 (not 36 as calculated in the PSR).

Mr. Williams also objected to the ACCA determination. He asserted his prior convictions were not categorically "serious drug offenses" under the ACCA and challenged the PSR's contrary conclusion. According to Mr. Williams, his Oklahoma offenses were overbroad because they applied to hemp, which is not a federally controlled substance.

## 2. Sentencing Hearing

At the start of the sentencing hearing, the district court sought to clarify precisely what packages the government was attributing to Mr. Williams:

> As I understand it from the presentence report, Mr. Williams is being held accountable for the package that was actually seized, as well as the three packages that were mailed to the house that he shares with his common-law

wife. Is that a correct understanding of the facts? But that he is not being held responsible for some of the other suspicious packages, I'll say, that were noted and found, which were mailed to the brother's house where the package that was searched and seized was mailed; is that correct?

R. vol. 3 at 13.

The government confirmed the district court's understanding, "That's correct, Your Honor." *Id.* The government further explained, "We know now, post-arrest, and you will hear evidence on this today—probation doesn't have this—there were eight total packages from San Bernardino." *Id.* at 17.

"And does that eight include the three that are at issue?" the district court asked. *Id.* at 18. "Yes," the government confirmed. *Id.*

As the government now concedes, it did not put on any evidence at the sentencing hearing about the three packages delivered to Mr. Williams' house on 19th Street that were counted in the PSR and objected to by Mr. Williams—that is, "the three that [were] at issue." Aplee. Br. at 16. Instead, the government only introduced evidence about the eight packages delivered to the 39th Street address from San Bernadino—including the package initially flagged as suspicious on May 19 and the package actually intercepted on June 3—plus a ninth package delivered to 39th Street from Loma Linda, California. A USPIS investigator testified about the similarity between the packages delivered to 39th Street on May 19 and June 3. He also prepared a chart, based on his review of USPS records, which included seven other packages with allegedly similar characteristics:

7

| Tracking Number | Acceptance Date | Class of Service | Origin ZIP | Origin City | Origin State | Delivery Date | Approx. Weight | Postage |
|---|---|---|---|---|---|---|---|---|
| EJ300157531US | 6/1/2020 | Priority Mail Express(R) | 92405 | SAN BERNARDINO | CA | 6/3/2020 | 4 lbs. 15 oz. | $71.40 |
| EJ300153883US | 5/19/2020 | Priority Mail Express(R) | 92405 | SAN BERNARDINO | CA | 5/20/2020 | 2 lbs. 13 oz. | $52.95 |
| EJ300154977US | 5/14/2020 | Priority Mail Express(R) | 92405 | SAN BERNARDINO | CA | 5/15/2020 | 2 lbs. 5 oz. | $52.95 |
| EJ275241875US | 4/28/2020 | Priority Mail Express(R) | 92354 | LOMA LINDA | CA | 4/29/2020 | 1 lb. 15 oz. | $46.20 |
| EJ174409055US | 4/22/2020 | Priority Mail Express(R) | 92405 | SAN BERNARDINO | CA | 4/23/2020 | 3 lbs. 2 oz. | $59.65 |
| EJ205087300US | 3/25/2020 | Priority Mail Express(R) | 92411 | SAN BERNARDINO | CA | 3/26/2020 | 3 lbs. 13 oz. | $59.65 |
| EJ141147595US | 3/10/2020 | Priority Mail Express(R) | 92401 | SAN BERNARDINO | CA | 3/11/2020 | 1 lb. 10 oz. | $46.20 |
| EJ191805326US | 1/23/2020 | Priority Mail Express(R) | 92411 | SAN BERNARDINO | CA | 1/24/2020 | 1 lb. 1 oz. | $41.65 |
| EJ174404535US | 1/6/2020 | Priority Mail Express(R) | 92405 | SAN BERNARDINO | CA | 1/7/2020 | 1 lb. 5 oz. | $26.20 |

R. vol. 3 at 73; R. vol. 2 at 45.

The USPIS investigator testified the April 22 package was found empty at the 39th Street house during the execution of the search warrant. And he explained that the weights represented in the approximate-weight column accounted for the whole weight of the parcel, including both the packaging material and the contents. None of the other six packages described in the chart were recovered.

Following the government's presentation of evidence, the district court observed, "It seems like the testimony I have heard at least leads to a pretty strong inference that we had as many as ten packages that it's reasonable to infer contained methamphetamine. He's only been held accountable for the one that was actually seized, plus three more, if I'm understanding correctly, in the PSR." R. vol. 3 at 84. Ultimately, the district court found the evidence presented supported the PSR's drug-quantity calculation:

> Having heard all the testimony that I have heard today, and given, you know, I think the quite strong circumstantial evidence that points to the fact that these packages were like the package that was seized such that we can

8

infer that they did, in fact, contain methamphetamine and that the weights of the methamphetamine for which Mr. Williams is being held accountable—you know, even if we talk about packaging and other things . . . that he could have been held responsible for a lot more than he's actually being held responsible for. Such that I think that I can reasonably approximate the amount that he should be held accountable for as relevant conduct, and I think that the amount contained in those paragraphs in the presentence investigation report are, therefore, reasonable and supported by the evidence.

*Id.* at 90-91.

The district court overruled Mr. Williams' objection and decided his base offense level was 36.

As for Mr. Williams' ACCA objection, the district court expressly declined to address it. The district court observed the ACCA designation increased the statutory sentencing range on count three—the § 922(g) charge—from a maximum of 10 years to a minimum of 15 years. The district court then determined the ACCA designation did not affect the guidelines range and sentenced Mr. Williams under the ACCA.

With a total offense level of 38 and criminal history category VI, Mr. Williams' guidelines range was 360 months to life imprisonment. The district court granted a downward variance from the guidelines range and imposed concurrent 284-month sentences on each count.

Mr. Williams timely appealed.

## II.    Discussion

Mr. Williams appeals his sentence on two grounds. First, he contends the district court erred in its drug-quantity calculation by relying on the three packages sent to his house when he specifically objected to including those packages and the

9

government presented no evidence about them. Second, Mr. Williams maintains the district court imposed an illegal sentence on count three by applying the ACCA. According to Mr. Williams, the district court erroneously calculated the statutory sentencing range because his state offenses are categorically broader than the ACCA's definition of "serious drug offense"—specifically, the definition of "marijuana" under Oklahoma law that applied to his prior convictions includes hemp and therefore is broader than the federal definition.

The government argues the district court did not clearly err by finding Mr. Williams was responsible for more than 30,000 kilograms of controverted drug weight. The government acknowledges it did not present evidence about the three contested packages on which the PSR relied. But the government maintains the evidence it did present—i.e., the eight packages sent to the 39th Street residence from San Bernardino—would support a finding of at least 30,000 kilograms of converted drug weight.[2]

The government further contends the district court correctly sentenced Mr. Williams under the ACCA. The government does not dispute Mr. Williams' prior Oklahoma convictions are overbroad when compared to the *current* federal definition of marijuana. However, the government insists the appropriate point of comparison is the federal definition of marijuana that existed at the time of Mr. Williams' prior

---

[2] The chart the government presented at sentencing included a ninth package sent to the 39th Street address from Loma Linda, California, but the government does not rely on this package on appeal.

10

state offenses. Mr. Williams' prior crimes are "serious drug offenses" for ACCA purposes, the government maintains, because Oklahoma's definition of marijuana was not overbroad when he committed his state offenses. The government also invites this court to find any ACCA error harmless based on the "concurrent sentence doctrine."

We agree with Mr. Williams that resentencing is required. The district court should not have relied, over Mr. Williams' objection, on the three contested packages sent to his residence on which the government presented no evidence. The government does not appear to argue otherwise—as we explain, its argument for affirmance goes not to whether the district court erred but to whether any error was harmless. Because the government has failed to show harmlessness, however, we remand for the district court to reconsider its drug-quantity findings.

As to the ACCA issue, the district court erred in enhancing Mr. Williams' sentence based on his three prior Oklahoma convictions for possession of a controlled dangerous substance. We agree with Mr. Williams that, as he argued in district court and maintains on appeal, his prior state offenses are categorically broader than the definition of "serious drug offense" because they apply to hemp, which was not federally controlled at the time of Mr. Williams' underlying offense under § 922(g). In so concluding, we reject the government's assertion that we must compare Mr. Williams' prior state drug offenses to the federal drug schedules as they existed at the time of the prior offenses. Consistent with the overwhelming majority of circuit courts to have considered the issue, we hold: to determine whether a prior

11

drug offense is categorically overbroad because it is not limited to federally controlled substances, the court must look to the current federal definition of "controlled substance"—i.e., the definition in effect at the time of the instant federal offense, not at the time of the prior state offense.[3]

### A. The drug-quantity issue requires remand.

"We review the court's 'determination of the quantity of drugs for which the defendant is held accountable under the Guidelines for clear error.'" *United States v. Aragon*, 922 F.3d 1102, 1110 (10th Cir. 2019) (citation omitted). "Drug quantities employed by the district court to calculate the applicable Guidelines range may be said to be clearly erroneous only when 'the district court's finding was without factual support in the record or we are left with the definite and firm conviction that a mistake has been made.'" *Id.* at 1110-11 (citation omitted). "When the actual drugs underlying a drug quantity determination are not seized, the trial court may rely upon an estimate to establish the defendant's guideline offense level 'so long as the information relied upon has some basis of support in the facts of the particular case and bears sufficient indicia of reliability.'" *United States v. Dalton*, 409 F.3d 1247,

---

[3] The federal definition of marijuana excluded hemp when Mr. Williams illegally possessed a firearm and at the time he was sentenced in this case. Thus, this appeal does not present the question, or require us to decide, whether the district court looks to the federal definition at the time of the *commission* of the instant federal offense or at the time of *sentencing* thereon. *Compare United States v. Hope*, 28 F.4th 487, 504-05 (4th Cir. 2022) (applying definition at time of sentencing), *with United States v. Jackson*, 36 F.4th 1294, 1297 (11th Cir. 2022) (applying definition at time of commission of offense). We leave that issue open for future resolution in the appropriate case.

12

1251 (10th Cir. 2005) (citation omitted). "Although estimates are not forbidden, 'the need to estimate drug quantities at times is not a license to calculate drug quantities by guesswork.'" *Aragon*, 922 F.3d at 1111 (citation omitted). "Moreover, 'when choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution.'" *Id.* (citation omitted).

### 1. The drug-quantity calculation was based on three contested packages sent to Mr. Williams' residence on which the government presented no evidence.

Mr. Williams contends the district court clearly erred in relying on the three packages sent to his residence on 19th Street to calculate drug quantity under U.S.S.G. § 2D1.1(c). As Mr. Williams points out, he specifically objected to the PSR's reliance on these packages, the district court understood them to be "at issue" at the sentencing hearing, yet the government "elicited no evidentiary support that these three contested parcels even existed." Opening Br. at 18 (emphasis omitted).

The government concedes that relying on these three contested packages in the drug-quantity finding would be error. Oral Arg. at 18:05 ("It would have been error for them to rely on the three."). But the government insists it is not clear whether the district court actually relied on those packages here. According to the government, when it is unclear how a district court arrived at its drug-quantity calculation, this court will not find clear error if there is "more than enough evidence" in the record to support the district court's ultimate drug-quantity finding. Aplee. Br. at 17 n.8 (quoting *United States v. Rollen*, 239 F. App'x 451, 455 & n.3 (10th Cir. 2007)). The

13

government maintains the evidence it did present at the sentencing hearing—i.e., evidence related only to the eight packages sent to the 39th Street residence from San Bernardino—was sufficient to support the district court's ultimate finding, and therefore the district court did not clearly err. As we explain, the drug-quantity finding requires reversal. The government's contrary arguments are unpersuasive.

The government offers only our unpublished decision in *Rollen* to support its "more than enough" evidence standard, but that case is readily distinguishable. In *Rollen*, like in this case, "it [was] unclear from the record how the district court arrived at its calculation." *Rollen*, 239 F. App'x at 455 n.3. But, unlike in this case, "the evidence the court relied upon in calculating the drug quantity attributable to [the defendant] bore sufficient indicia of reliability." *Id.* at 456. Here, even the government's interpretation of the record confirms the district court, at minimum, potentially relied on contested allegations in the PSR for which there was no evidence—this would constitute clear error. Under the circumstances, we find *Rollen* does not support affirmance.

The record demonstrates the district court's drug-quantity finding relied at least in part on the three packages about which the government presented no evidence. Recall what happened at the sentencing hearing.

At the outset, the district court asked the government about the evidentiary basis for the drug-quantity calculation. The court wanted to know if it correctly understood that (1) only the three packages delivered to Mr. Williams' house at 19th Street were at issue and (2) Mr. Williams was not being held responsible for the other

14

packages sent to his brother's house at 39th Street that the PSR disclaimed. The government stated it would present evidence of *eight* packages, and in doing so, assured the district court the "three that [were] at issue" sent to the 19th Street residence were included among them. As it turned out, the government only presented evidence of packages delivered to the 39th Street residence. Those are the packages, expressly disclaimed in the PSR, for which the district court understood Mr. Williams was not being held responsible. The evidence the government said it would offer at the sentencing hearing was not what it actually presented. Despite the discrepancy, the government did not clarify that, in fact, no evidence had been presented about the three contested packages sent to Mr. Williams' residence.[4]

There can be no serious question the district court reasonably believed the government had actually presented evidence supporting the "three [packages] that [were] at issue." For example, after the government's presentation, the district court remarked there was evidence of "as many as ten packages," but found Mr. Williams was only being "held accountable for the one that was actually seized, *plus three more*." R. vol. 3 at 84 (emphasis added). In its ultimate drug-quantity findings, the district court found "*these packages* were like the package that was seized such that we can infer that they did, in fact, contain methamphetamine." *Id.* at 90 (emphasis added). In context, "these packages" referred to the three contested packages

---

[4] The USPIS inspector did mention that only the packages represented in the chart were "destined for 104 Southeast 39th Street." R. vol. 3 at 73. However, this passing reference to the address was not enough to clarify that the government's evidence did not relate to the "three [packages] that [were] at issue." *Id.* at 18.

delivered to 19th Street relied on in the PSR—indeed, that is the government's interpretation as well. Aplee. Br. at 17 n.8. ("[T]hese packages [referring to the three packages counted in the presentence report] were like the package that was seized such that we can infer that they did, in fact, contain methamphetamine." (alteration in original) (quoting district court)). To be sure, the exact basis for the district court's calculation is not perfectly clear. But the record leaves little doubt the district court understood the evidence on drug quantity conformed to what the government had promised and thus the district court actually relied, at least in part, on the three contested packages for which there was no evidence presented. Under these circumstances, as the government agrees, reliance on the three packages constitutes clear error.

## 2. The government has not met its burden of proving harmlessness.

According to the government, the district court did not clearly err because other evidence in the record supported the district court's total drug-quantity finding—at least 30,000 kilograms of converted drug weight. We are not persuaded. As we explain, the government's contention goes to the question of harmlessness, not error.

The government made a similar argument in *United States v. Harrison*, 743 F.3d 760 (10th Cir. 2014). There, we held the district court clearly erred in summarily overruling a defendant's objection where it mistakenly believed the PSR's drug-quantity calculation was appropriately based on trial evidence. *Id.* at 764. The government argued "the district court did not clearly err because trial evidence

supports the court's determination that Defendant was responsible for more than 1.5 kilograms of methamphetamine, even though the PSR calculation was not based on that evidence." *Id.* Rejecting the government's position, we explained, "The government's argument is flawed because the court did not purport to rely on evidence at trial that was not mentioned in the PSR. The district court clearly committed error; the only remaining question is whether the error was harmless." *Id.* The same is true here.

The district court erred in relying on drug quantities for which there was no evidence presented. That is the end of the error inquiry. Whether other evidence in the record nevertheless supports the district court's drug-quantity finding, as the government claims, goes to whether the error was harmless. And on that matter, the government has not met its burden.

"As the beneficiary of the error, the government bears the burden of proving harmlessness by a preponderance of the evidence." *United States v. Burris*, 29 F.4th 1232, 1238 (10th Cir. 2022). "[A]n error is not harmless if it requires us to 'speculate on whether the court would have reached [the same] determination' absent the error." *Harrison*, 743 F.3d at 764 (second alteration in original) (citation omitted). "Accordingly, if the district court failed to make a necessary fact finding, we ordinarily reverse and remand for the court to do so." *Id.*

In support of its harmlessness contention, the government proposes a drug-quantity calculation using the packages on which it presented evidence at the sentencing hearing. The government's calculation estimates the quantity of drugs in

17

each package by extrapolating the weight-to-packaging ratio from the intercepted package. According to the government, the intercepted package was approximately 76% methamphetamine and 24% packaging by weight. Applying that ratio to the packages sent from San Bernardino to the 39th Street residence, the government calculates a total drug weight of approximately 5.5 kilograms of methamphetamine, which it maintains is enough to cross the threshold of 30,000 kilograms of converted drug weight when combined with the actual methamphetamine intercepted.

Here, the district court made no specific drug-quantity findings based on the evidence the government *actually* presented. While the government's approach to calculating drug quantity does not strike us as unreasonable, it requires initial fact-finding and invites speculation. Adopting the government's calculation on appeal would require us to guess about which methodology the district court would have used to calculate drug quantity, how reliable it would have found the evidence, and how conservative it might have been in its estimation. As in *Harrison*, "we cannot say . . . how much the court would feel justified in extrapolating from the evidence." *Id.* at 765. And we are "particularly hesitant because the PSR did not see fit to refer to [this evidence]." *Id.* Under these circumstances, we reject the government's invitation to find harmless error by adopting in the first instance its proposed approach to calculating drug quantity. *See United States v. Roberts*, 14 F.3d 502, 523 (10th Cir. 1993) ("[I]t is not this court's role to make the factual findings necessary to support a sentencing calculation; that is the task of the district court." (citation omitted)).

We thus follow our ordinary course and reverse and remand so the district court may consider the government's approach and make further drug-quantity findings. *Harrison*, 743 F.3d at 764 ("We [reverse and remand] because we are not sufficiently confident that the district court, had it considered the matter, would have found at least 1.5 kilograms of methamphetamine based on the trial testimony.").[5]

### B. Mr. Williams' prior convictions are not categorically "serious drug offenses" under the ACCA.

Mr. Williams has consistently maintained the ACCA does not apply to him. The district court sentenced Mr. Williams under the ACCA—without reaching the merits of Mr. Williams' objection[6]—based on his three prior Oklahoma convictions

---

[5] Neither party addressed whether resentencing should be limited to the existing record. We need not decide the issue and leave it to the district court's discretion on remand. We note that under similar circumstances we have expressly limited resentencing to the existing record. *See United States v. Thomas*, 749 F.3d 1302, 1315-16 (10th Cir. 2014) (limiting resentencing to the existing record where (1) government bore burden of proof, (2) defendant alerted government to deficiency in its proof, and (3) government failed to cure deficiency). *But see Aragon*, 922 F.3d at 1113.

[6] We note the parties have not asked us to remand to allow the district court to address the merits in the first instance. Indeed, Mr. Williams preserved the issue by raising it below, the parties fully briefed it on appeal, and its resolution involves a pure question of law. *Manzanares v. Higdon*, 575 F.3d 1135, 1146 n.10 (10th Cir. 2009) ("Although the district court did not reach this issue, it is a purely legal determination that was argued below and that we may decide on the record. Moreover, the parties briefed this issue, providing us the benefit of the adversarial process." (citations omitted)). We may proceed so long as the record is "adequately developed." *United States v. Shrum*, 908 F.3d 1219, 1234 & n.10 (10th Cir. 2018) ("[W]e decline to remand this case so that the district court may undertake the proper analysis in the first instance."). Under these circumstances, and in the interest of judicial economy, we will proceed to the merits of the ACCA issue. *Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1264 (10th Cir. 2001) ("Because the facts relevant to that issue are uncontroverted and the issue thus hinges on a question

19

for possessing with intent to distribute a controlled dangerous substance in violation of Okla. Stat. tit. 63, § 2-401(A)(1). On appeal, Mr. Williams maintains his prior convictions are not categorically "serious drug offenses" and the district court imposed an illegal sentence by enhancing his sentence under the ACCA. Whether a prior conviction qualifies as an ACCA predicate is a legal question we review de novo. *United States v. Titties*, 852 F.3d 1257, 1263 (10th Cir. 2017).

The definition of "serious drug offense" expressly incorporates the federal definition of controlled substances. 18 U.S.C. § 924(e)(2)(A)(ii).[7] Under the categorical approach, a state drug offense that includes non-federally controlled substances is overbroad and thus not categorically a "serious drug offense." *United States v. Cantu*, 964 F.3d 924, 934 (10th Cir. 2020). In *Cantu*, we held that section 2-401(A)(1)—Mr. Williams' prior statute of conviction—is not categorically a "serious drug offense" under the ACCA because it applies to at least three non-federally controlled substances. *Id.* However, in a later unpublished opinion, we recognized those three substances that rendered the statute overbroad were not added until November 1, 2008; thus, Oklahoma convictions under section 2-401(A)(1)

---

of statutory interpretation, we have discretion to decide it in the first instance and conclude that doing so is in the interests of judicial economy."); *see also Attocknie v. Smith*, 798 F.3d 1252, 1259 (10th Cir. 2015) ("If the district court failed to address an issue, we can still reverse on that ground if the issue was preserved and is meritorious.").

[7] The term "serious drug offense" includes "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))." 18 U.S.C. § 924(e)(2)(A)(ii).

before November 1, 2008, are not overbroad and qualify as ACCA predicates. *United States v. Traywicks*, 827 F. App'x 889, 891 (10th Cir. 2020). Here, Mr. Williams' three Oklahoma convictions are from 1996, 1997, and 2003. Under *Traywicks*, these pre-2008 offenses would seem to qualify as ACCA predicates.

Nevertheless, Mr. Williams contends section 2-401(A)(1) is categorically overbroad—criminalizing more substances than does the federal drug schedule—because the definition of marijuana that applied in Oklahoma from 1996-2003 criminalized hemp, while the current federal definition of marijuana expressly excludes it. *Compare* Okla. Stat. tit. 63, § 2-101(2) (1996), *id.* (1997), *id.* (2003), *with* 21 U.S.C. § 802(16)(B) ("The term 'marihuana' does not include . . . hemp . . . ."). Mr. Williams thus argues, under *Cantu*, his prior Oklahoma convictions are not categorically "serious drug offenses."

The government does not dispute Mr. Williams' prior offenses are categorically broader than the *current* federal definition but insists Mr. Williams is looking at the wrong federal drug schedules. According to the government, we should compare Mr. Williams' prior Oklahoma convictions to the federal drug schedules in effect at the time of those state convictions—not the schedules in effect at the time of his underlying federal offense. The government also urges us to invoke the "concurrent sentence doctrine" and hold any error in sentencing Mr. Williams under ACCA was harmless because, whether or not Mr. Williams is ACCA eligible, his 284-month concurrent sentence on the methamphetamine distribution count remains unaffected.

For starters, the district court mistakenly assumed there was no need to resolve the merits of Mr. Williams' objection to the ACCA enhancement because it did not "affect the guideline range calculation." R. vol. 3 at 23. Nothing in the Guidelines relieves the district court of its duty to correctly determine the statutory sentencing range. Indeed, the Guidelines expressly provides, regardless of the otherwise applicable guideline range, the sentence on each count must fall within the statutory sentencing range. *See generally* U.S.S.G. §§ 5G1.1-.2.

On the merits, we need only decide one underlying legal issue to determine whether the district court erroneously sentenced Mr. Williams under the ACCA. As the appellate briefing confirms, the application of the ACCA enhancement turns on whether the Oklahoma offense is overbroad, and on that point, the parties disagree only on which *version* of the federal definition of marijuana to consult—the one in effect at the time of the instant federal offense, or the version that existed at the time of the prior Oklahoma convictions.

This is a question of first impression in our circuit, though *Cantu* anticipated our need to answer it. *Cantu*, 964 F.3d at 936-37 (Hartz, J., concurring). Six of our sister circuits have recently considered this same timing issue and all but one have resolved it in support of Mr. Williams' position. *See United States v. Bautista*, 989 F.3d 698, 703 (9th Cir. 2021); *United States v. Abdulaziz*, 998 F.3d 519, 531 (1st Cir. 2021); *United States v. Hope*, 28 F.4th 487, 504-05 (4th Cir. 2022); *United States v. Jackson*, 36 F.4th 1294, 1297 (11th Cir. 2022); *United States v. Perez*, No. 21-2130, 2022 WL 3453566, at *3 (8th Cir. Aug. 18, 2022). *But see United States v. Clark*,

No. 21-6038, 2022 WL 3500188, at *1 (6th Cir. Aug. 18, 2022). Consistent with the First, Fourth, Eighth, Ninth, and Eleventh Circuits, we hold a defendant's prior state conviction is not categorically a "serious drug offense" under the ACCA if the prior offense included substances not federally controlled at the time of the instant federal offense. We thus reject the government's time-of-prior-state-conviction rule and adopt a time-of-instant-federal-offense comparison.[8]

   1.  **The overwhelming majority of circuits to have considered the issue agree the correct point of comparison is the time of the instant federal offense—not the prior state offense.**

        a.  *Cantu* concurrence

In *Cantu*, we held the defendants' prior conviction under section 2-401(A)(1) was not a "serious drug offense" because it included at least three non-federally controlled substances. 964 F.3d at 934. There was "no dispute" in *Cantu* that "at all relevant times Oklahoma law included three substances as controlled dangerous substances which were not controlled substances under federal law." *Id.* at 937 (Hartz, J., concurring). In his concurrence, Judge Hartz observed "this court may

---

[8] In *Hope*, 28 F.4th at 504-05, the Fourth Circuit held the appropriate comparison is to the federal schedule in effect at the time of *sentencing* on the instant federal offense, while in *Jackson*, 36 F.4th at 1297, the Eleventh Circuit looked to the federal schedule at the time of the *commission* of the instant federal offense. *See also United States v. Brown*, No. 21-1510, 2022 WL 3711868, at *5 (3d Cir. Aug. 29, 2022) (agreeing with the Eleventh Circuit that "courts must look to the federal law in effect when the defendant committed the federal offense"). Here, the federal schedules excluded hemp at both times—Mr. Williams' commission of the instant firearm offense and his sentencing thereon. Thus, we need not decide in this case which definition would apply if, for example, a prior offense was overbroad at the time of the commission of the offense, but not at sentencing.

need to resolve [the timing issue] in future cases that concern whether a prior conviction is a conviction for a violent felony or serious drug offense under the ACCA." *Id.* at 936. He opined, "As I understand the ACCA and Supreme Court authority, the comparison that must be made is between what the defendant could have been convicted of at the time of the commission of the predicate state offense and what constitutes a federal drug offense at the time of the federal offense." *Id.* Using the federal drug schedule in effect at the time of the federal offense, he explained, would put "the defendant . . . on notice when he committed his federal crime that he had a serious drug offense on his record, and I would think that the state offense would be a proper predicate serious drug offense under the ACCA." *Id.* at 936-37.

### b. *Bautista*[9]

The Ninth Circuit was first to address the issue in a majority opinion, albeit in the context of the Guidelines, not the ACCA. *Bautista*, 989 F.3d at 703. In *Bautista*, as here, the defendant argued that his prior state conviction was overbroad because it applied to hemp and the existing federal definition of "controlled substance" did not. *Id.* at 701. The Ninth Circuit held it "must compare [the defendant's] prior state-law conviction with federal law at the time of his federal sentencing." *Id.* at 704. It

---

[9] The government's primary argument on appeal is *Bautista* was distinguishable because it arose in the context of the Guidelines—a different rule, the government insisted, should apply to the ACCA. But as we discuss, since the briefing and oral argument in this case, three circuit courts have adopted *Bautista*'s timing rule in the ACCA context.

rejected the government's proposed rule that the prior state "crime must be compared to federal law at the time of the prior state conviction." *Id.* at 703. As the Ninth Circuit framed it, "The question before us is whether the sentencing court should determine the relevance of [a defendant's] prior state conviction under the federal sentencing law that exists at the time of sentencing or under federal sentencing law that no longer exists." *Id.* The court found no support for the government's position that it "must ignore current federal law and turn to a superseded version of the United States Code. Indeed, it would be illogical to conclude that federal sentencing law attaches 'culpability and dangerousness' to an act that, at the time of sentencing, Congress has concluded is *not* culpable and dangerous." *Id.* "Such a view," it explained, "would prevent amendments to federal criminal law from affecting federal sentencing and would hamper Congress' ability to revise federal criminal law." *Id.*

c.  *Abdulaziz*

Shortly after *Bautista*, the First Circuit joined the Ninth in holding a defendant's prior conviction, which proscribed hemp, was not a "controlled substance offense" under the Guidelines because hemp was not a federally controlled substance at the time of the federal sentencing. *Abdulaziz*, 998 F.3d at 531.[10] The First Circuit deemed the inquiry "fairly straightforward":

---

[10] We note both *Bautista* and *Abdulaziz* understood the term "controlled substance" as used in the Guidelines to mean a substance listed in CSA. *See Bautista*, 989 F.3d at 702 (citing *United States v. Leal-Vega*, 680 F.3d 1160, 1167 (9th Cir. 2012)); *Abdulaziz*, 998 F.3d at 529; *but see United States v. Jones*, 15 F.4th 1288, 1294 (10th Cir. 2021) (holding § 4B1.2(b) does not limit the meaning of a

[I]nsofar as the CSA's drug schedules were incorporated into the guideline itself at the time of [the defendant's] § 922(g) sentencing, it would appear that the answer to our question is fairly straightforward: we must look to the version of those drug schedules that were "in effect" at that time to determine what constituted a "controlled substance" at that time.

*Id.* at 523 (citations omitted).

### d.  *Hope*

In *Hope*, as here, the defendant argued his prior state drug conviction was not a "serious drug offense" because the state law definition of "marijuana" was broader than the recently amended federal definition. 28 F.4th at 499. Relying on *Bautista*, the Fourth Circuit held it must "compare the definition of 'marijuana' under federal law at the time of [the defendant's] sentencing . . . with [the state's] definition of 'marijuana' at the time he was sentenced for his [prior] state offenses." *Id.* at 504.

### e.  *Jackson*

In *Jackson*, the Eleventh Circuit considered whether the defendant's prior state drug conviction was broader than the ACCA's definition of "serious drug offense" because the federal government recently removed from the federal schedule a substance included in the defendant's prior state offense. 36 F.4th at 1297. As the Eleventh Circuit framed the issue,

This appeal requires us to decide which version of the Controlled Substance Act Schedules incorporated into ACCA's definition of "serious drug offense" applies when a defendant is convicted of being a felon in possession of a firearm: the version in effect at the time of the defendant's

"controlled substance" to substances listed in the CSA), *petition for cert. filed*, (U.S. Aug. 11, 2022) (No. 22-5342).

> federal firearm-possession violation (for which he is being sentenced), or the ones in effect when he was convicted of his predicate state crimes that we are evaluating to see whether they satisfy ACCA's definition of "serious drug offense."

*Id.* It held "due-process fair-notice considerations require [courts] to apply the version of the Controlled Substance Act Schedules in place when the defendant committed the federal firearm-possession offense for which he is being sentenced." *Id.* "That way, [a defendant] ha[s] notice at the time of his firearm-possession offense not only that his conduct violated federal law, but also of his potential minimum and maximum penalty for his violation and whether his prior felony convictions could affect those penalties." *Id.* at 1300.

### f. *Perez*

Most recently, in *Perez*, the Eighth Circuit likewise "conclude[d] that the relevant federal definition for ACCA purposes is the definition in effect at the time of the federal offense." 2022 WL 3453566, at *3. The Eighth Circuit noted its "agreement with all other circuit courts of appeals to have addressed the question." *Id.* at 5 n.1. It explained, "Whether a previous state conviction is a serious drug offense only becomes salient at the time of sentencing for a federal conviction under 18 U.S.C. § 922(g). Therefore, the federal law in effect at the time of the federal sentencing is the relevant definition for ACCA purposes." *Id.* at *3. The Eighth Circuit found the "government's insistence that we deviate from the usual rule of applying the federal law in force at the time of a federal offense [wa]s unavailing." *Id.* at *4.

g. *Clark*

In *Clark*, decided on the same day as *Perez*, the Sixth Circuit became the only court to adopt the government's proposed time-of-conviction approach for sentencing enhancements. *Clark*, 2022 WL 3500188, at *1. *Clark* considered the timing issue in the context of the Guidelines' career offender enhancement, concluding a "time-of-conviction approach flows from the Guidelines' text." *Id.* at *3. Specifically, the *Clark* court focused on the text of the Guidelines requiring the instant offense to be "subsequent" to "prior" convictions and decided this language "indicates that the court should take a backward-looking approach and assess the nature of the predicate offenses at the time the convictions for those offenses occurred." *Id.* The Sixth Circuit also relied on *McNeill v. United States*, 563 U.S. 816 (2016), which every other circuit had expressly distinguished.

As we will explain, the correct point of comparison is the time of the instant federal offense—not the prior state offense—as the First, Fourth, Eighth, Ninth, and Eleventh Circuits have likewise soundly determined. We find the government's contrary arguments unconvincing.

**2. Analysis**

The issue here concerns whether a prior conviction qualifies as an ACCA predicate. We start with the text of the statute. *McNeill*, 563 U.S. at 819. Under the ACCA, a defendant convicted of being a felon in possession of a firearm is subject to a mandatory minimum of 15 years of imprisonment if he "has three previous convictions . . . for a violent felony or a serious drug offense." 18 U.S.C. § 924(e)(1).

28

As relevant here, a "serious drug offense" is "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))." *Id.* § 924(e)(2)(A)(ii).

Mr. Williams contends this federal sentencing statute—including the expressly incorporated federal definition of "controlled substance"—should be applied as it exists at the time of the instant federal offense. The government urges us to interpret the ACCA by applying the definition of "controlled substance" as it existed at the time of the prior state conviction. The plain language supports Mr. Williams. The statute expressly cross-references the definition of controlled substance "in section 102 of the Controlled Substances Act (21 U.S.C. 802)." *Id.* Nothing in the language of the statute indicates Congress intended "controlled substance" to incorporate historical versions of the federal drug schedules—and the government does not contend otherwise. Absent any such textual indication, we apply the federal definition in its current form.[11]

---

[11] Notably, the government urges a very narrow application of its time-of-prior-conviction rule, limited just to the definition of "controlled substance" at issue here. That is, the government does not suggest that courts should *always* compare a prior offense to the ACCA definitions of "violent felony" and "serious drug offense" that existed at the time of the prior offense—and for good reason. As the Ninth Circuit sensibly recognized, it would be "illogical" to "ignore current federal law and turn to a superseded version of the United States Code." *Bautista*, 989 F.3d at 703. Such a rule "would prevent amendments to federal criminal law from affecting federal sentencing and would hamper Congress' ability to revise federal criminal law." *Id.* Indeed, we have previously applied the ACCA based on prior convictions that occurred before the ACCA was enacted, holding that doing so did not violate the Ex Post Facto Clause. *United States v. Springfield*, 337 F.3d 1175, 1178-79 (10th Cir.

As Judge Hartz observed in his concurrence in *Cantu* and the Eleventh Circuit recently emphasized in *Jackson*, applying the federal definition in effect at the time of the federal offense is most consistent with fundamental principles of due process. *Cantu*, 964 F.3d at 936-37 ("[T]he defendant [would be] on notice when he committed his federal crime that he had a serious drug offense on his record."); *Jackson*, 36 F.4th at 1297 ("We hold that due-process fair-notice considerations require us to apply the version of the Controlled Substance Act Schedules in place when the defendant committed the federal firearm-possession offense for which he is being sentenced.").

Sentencing provisions must give ordinary people fair notice of the consequences of violating a criminal statute. *See Johnson v. United States*, 576 U.S. 591, 595-96 (2016); *United States v. Batchelder*, 442 U.S. 114, 123 (1979). Although typically attendant to vagueness challenges, fair-notice considerations must also "apply with at least as much force when a statute does unambiguously delineate the conduct that violates it, and the defendant's conduct does not satisfy that standard." *Jackson*, 36 F.4th at 1300. Here, the plain language of the federal statutes in effect at the time of Mr. Williams' federal offense indicates that he is not an armed career criminal because his prior offenses are categorically overbroad. Enhancing Mr.

---

2003). Implicit in this analysis is that a prior conviction is an ACCA predicate if it meets the definition of "violent felony" or "serious drug offense" at the time of the instant federal offense—were it otherwise, then no convictions predating the passage of the ACCA could qualify as predicates. The government does not expressly dispute this general application of the ACCA, and we will not read into the ACCA an exception solely for the definition of "controlled substances."

30

Williams' sentence based on a conflicting definition that predates his federal offense would deprive him of fair notice of the consequences of violating federal law. Thus, he must be sentenced according to the federal definition of "controlled substance" in effect at the time of his federal offense, as expressly referenced in the ACCA.

### 3.  The government's counterarguments are unpersuasive.

The government raises several arguments supporting affirmance, but none is availing.

First, the government argues the Supreme Court's decision in *McNeill*, 563 U.S. 816, supports its proposed time-of-prior-state-conviction rule. According to the government, *McNeill* noted "the plain text of the ACCA 'requires the court [to] determine whether a "previous conviction" was for a serious drug offense,' which is a '*backward-looking question*' that can only be answered by 'consult[ing] the law that applied at the time of conviction.'" Aplee. Br. at 33 (alteration in original) (quoting *McNeill*, 563 U.S. at 820).

However, in *McNeill* the Supreme Court was discussing a subsequent change in the prior offense of conviction—and not the federal definition to which it is compared. It is undisputed we look to the definition of the prior state offense at the time of the prior state conviction—that defines what the defendant was actually convicted of violating. *McNeill* has no bearing on what version of *federal law* serves as the point of comparison for the prior state offense, which is the question here. *See Bautista*, 989 F.3d at 703 ("*McNeill* nowhere implies that the court must ignore current federal law and turn to a superseded version of the United States Code.");

31

*Abdulaziz*, 998 F.3d at 527 ("[T]he government's reliance on *McNeill* here is misplaced."); *Hope*, 28 F.4th at 505 ("*McNeill* does not prohibit us from considering changes to federal law for the purposes of the ACCA."); *Jackson*, 36 F.4th at 1306 ("*McNeill*'s reasoning, which relied on the language 'previous convictions,' has no application here."); *Perez*, 2022 WL 3453566, at *4 ("[T]he reasoning in *McNeill* regarding state law does not translate to this issue concerning the federal drug statute."). *But see Clark*, 2022 WL 3500188, at *3 ("*McNeill* definitively held that the time of conviction is the proper reference under the ACCA.").[12]

The government also relies on cases in the immigration context to support its position, but we are not persuaded. Immigration statutes authorize the removal of a non-citizen convicted of an offense related to a federal controlled substance. *See Mellouli v. Lynch*, 575 U.S. 798, 801 (2015). According to the government, in determining whether a non-citizen's prior conviction authorizes their removal because it categorically related to a federal controlled substance, courts compare the state and federal drug schedules at the time of the prior conviction. *See, e.g.*, *Medina-Rodriguez v. Barr*, 979 F.3d 738, 749 (9th Cir. 2020). Though circuit courts have

---

[12] According to the Sixth Circuit, courts that have dismissed *McNeill* "insufficiently grapple with the Supreme Court's reasoning" in that case. *Clark*, 2022 WL 3500188, at *6. Not so. The First, Fourth, Eighth, Ninth, and Eleventh Circuits meaningfully considered *McNeill* and correctly recognized, as we do, that *McNeill* did not contemplate what version of federal law to apply, let alone "definitively h[o]ld that the time of conviction is the proper reference under the ACCA." *Id.* at *3. The Sixth Circuit reads *McNeill* too broadly and offers no reason to disturb our holding here, which aligns with the majority of circuit courts to have considered the issue.

32

consistently applied a "time-of-conviction" rule in the immigration context, that does not disturb our conclusion here that a time-of-instant-federal-offense comparison applies in the ACCA context.[13]

Where a non-citizen is removable immediately upon being convicted of an offense involving a controlled substance, it makes sense to determine whether the conviction is a removable offense *at the time of that controlled-substance conviction*. But whether a prior conviction will serve as a predicate ACCA offense has no immediate impact at the time of the prior conviction. It is only after a defendant has three such convictions and violates 18 U.S.C. § 922(g) that a defendant can be deemed an armed career criminal for purposes of federal sentencing. *Perez*, 2022 WL 3453566, at *4 ("In the context of the ACCA, in contrast, there is no risk of immediate federal consequences from a state law conviction. Consequences of a prior conviction for ACCA purposes only arise if the person later is convicted of a qualifying federal offense.").

The justifications courts have relied on for implementing a time-of-conviction rule are unique to the immigration context and apply with significantly less force, if

---

[13] The government claims the Supreme Court compared the schedules that existed "[a]t the time of [the petitioner's] conviction" for purposes of the categorical approach in *Mellouli*. Aplee. Br. 34 (alteration in original) (quoting *Mellouli*, 575 U.S. at 808). However, it is unclear whether *Mellouli* was in fact looking to the federal schedules as they existed at the time of the conviction, or just the Kansas schedules at the time of the conviction. *Compare Medina-Rodriguez*, 979 F.3d at 749 ("[*Mellouli*] assumed that the time-of-conviction federal drug schedule is the appropriate one for the categorical approach comparison."), *with Abdulaziz*, 998 F.3d at 530 (observing *Mellouli* cited to the government's brief for the federal drug schedules, which in turn relied on the current federal schedules).

at all, in the ACCA context. For example, a "time-of-conviction rule allows an individual 'to anticipate the immigration consequences of a guilty plea or conviction at trial.'" *Medina-Rodriguez*, 979 F.3d at 748 (quoting *Doe v. Sessions*, 886 F.3d 203, 209 (2d Cir. 2018)). "Moreover, a time-of-conviction rule adheres to the Supreme Court's general prescription that a non-citizen defendant does not receive effective assistance of counsel unless counsel advises that defendant of the possible immigration consequences of a plea to a criminal charge. A time-of-removal rule would make the dispensing of such advice practically impossible." *Id.* (citing *Padilla v. Kentucky*, 559 U.S. 356, 366-69 (2010)). It is difficult even to articulate what the comparable Sixth Amendment interest would be where the ACCA enhancement is concerned—the right to be advised on whether a state conviction could potentially combine with two other convictions to support a federal sentencing enhancement if, hypothetically, the defendant commits a specific federal crime in the future? The immigration consequences of a controlled-substance conviction are immediate, but no such similar concerns justify a time-of-prior-state-conviction rule in the ACCA context. *Perez*, 2022 WL 3453566, at *4.

The government also makes several arguments that its approach serves various public policy principles and constitutional norms. For example, the government asserts the time-of-prior-state-conviction approach is consistent with the purpose of the ACCA, which is to increase punishment for repeat offenders. It would not, according to the government, make sense to allow convictions to "simply disappear[]" because the federal government excluded hemp in 2018. Aplee. Br. at

37. However, as Mr. Williams persuasively argues, if Congress has decided hemp should not be criminalized, then surely Congress would not intend for it to continue to be included within the narrow class of serious crimes that contributes to a 15-year mandatory minimum prison sentence. *See Perez*, 2022 WL 3453566, at *4 ("[R]elying on current federal definitions effectuates Congress's intent to remove certain substances from classification as federal drug offenses.").

The government also insists that applying current definitions "would be inconsistent with the principle that legislation does not apply retroactively in the absence of a clear and unambiguous directive of retroactivity." *Id.* at 38. The government posits a hypothetical scenario where substances are added to the federal schedules, causing a once-overbroad prior conviction to become a "serious drug offense" under the ACCA. According to the government, this would raise "both due process and ex post facto concerns." *Id.* Our precedent resolves these concerns. We have long held that "the ACCA is not retroactive." *United States v. Springfield*, 337 F.3d 1175, 1179 (10th Cir. 2003). And "every circuit court to address the issue has concluded that there is no ex post facto problem when a court enhances a sentence under the ACCA on the basis of convictions that occurred prior to the ACCA's passage." *Id.* The government does not explain how enacting the ACCA raises no ex post facto problem but amending the definition of a term *within* the ACCA does. In any event, the government's hypothetical is not before us.

Finally, the government points out Oklahoma removed hemp from its definition of marijuana in 2015 and thus Oklahoma's definition of marijuana has

35

never been broader than the federal definition, which did not exclude hemp until 2018. It would contravene the categorical approach, the government insists, to find a state statute overbroad when it has never been broader than the federal definition. However, as the Supreme Court reasoned in *McNeill*, subsequent changes in state law are irrelevant—we "turn[] to the version of state law that the defendant was actually convicted of violating." 563 U.S. at 821. Moreover, Oklahoma's current iteration of Mr. Williams' offense of conviction *is* overbroad, as we held in *Cantu*. That Oklahoma's current definition of "marijuana" is not broader than the current federal definition does not affect our analysis.

Accordingly, without the ACCA enhancement, the statutory maximum term of imprisonment on the § 922(g) violation was 10 years. The district court's imposition of 284 months (over 23 years) of imprisonment was an "illegal sentence." *Titties*, 852 F.3d at 1264. We have held such an illegal sentence is "per se[] reversible," even under plain error review. *Id.* However, the government urges us to invoke the concurrent sentence doctrine and hold that any error was harmless. "Under that discretionary doctrine, we may hold harmless an erroneous sentence premised on a valid conviction if such sentence runs concurrently to an equal or longer sentence based upon another charge of an indictment, because the defendant suffers no actual prejudice from the erroneous sentence." *United States v. Segien*, 114 F.3d 1014, 1021 (10th Cir. 1997). Here, the illegal sentence runs concurrent to an equal 284-month sentence on the drug count.

36

Mr. Williams insists we should not invoke this discretionary appellate doctrine, which has at times been viewed with disfavor. *See United States v. Montoya*, 676 F.2d 428, 432 (10th Cir. 1982) ("A growing realization that adverse collateral consequences inexorably flow from most criminal convictions has prompted both courts and commentators to criticize frequent application of the [concurrent sentence] doctrine."). And Mr. Williams contends various collateral consequences flow from being designated an armed career criminal.

We need not address the propriety of invoking the concurrent sentence doctrine here because we are already remanding for resentencing based on the drug-quantity error. On remand, the district court certainly cannot reimpose what we have determined is an illegal sentence. Remember the erroneous drug-quantity finding drove the offense level not only for the drug count, but also for the firearm count because a cross-reference applied. Thus, remanding for reconsideration of drug quantity necessarily entails resentencing on the firearm count. Under these circumstances, we instruct the district court to resentence Mr. Williams on the § 922(g) count without the illegal ACCA enhancement.

### III.    Conclusion

The judgment is vacated. We remand for the district court to (1) make further drug-quantity findings and (2) resentence Mr. Williams without the ACCA enhancement.